IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 25, 2005 Session

## STATE OF TENNESSEE v. LARRY PEOPLES, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 79470     Richard R. Baumgartner, Judge**

———————————————

**No. E2005-00111-CCA-R3-CD - Filed January 13, 2006**

———————————————

On appeal, the defendant, Larry Peoples, contends that: (1) the State improperly impeached defense witnesses by failing to request a jury-out hearing before cross-examining them regarding prior bad acts, pursuant to Tennessee Rule of Evidence 608; and (2) he was denied a fair trial when the trial court denied his request for a mistrial or a curative instruction. We conclude that, while the State certainly should have requested a jury-out hearing prior to impeaching the witnesses, the defendant waived the issue by failing to raise a timely objection. Therefore, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Stephen A. Burroughs, Knoxville, Tennessee, for the appellant, Larry Peoples, Alias.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip Morton and Ta Kisha Fitzgerald , Assistant District Attorneys General, for the appellee, State of Tennessee

## OPINION

Facts and Procedural History

Following his indictment by a Knox County Grand Jury of one count of attempted aggravated rape (a Class B felony), the defendant was convicted by a jury of the lesser included offense of attempted sexual battery (a Class A misdemeanor). He was sentenced to eleven months, twenty-nine days but was released upon the application of his pretrial jail credit.

At trial, the victim testified that she and some friends went to Club Fiction on East Jackson Avenue in Knoxville on March 8, 2003. During her stay at the nightclub, the victim drank

approximately five beers and was introduced to the defendant by the defendant's sister, Shea, whom the victim had met previously. The victim danced with the defendant and other individuals at the club until approximately 1:00 a.m., when she and the defendant, among others, went to the defendant's sister's apartment at the Townview complex for an after party. At the after party, the victim consumed "a couple more beers" but denied taking any drugs.

At approximately 1:30 a.m., the victim passed out on the couch at the apartment and awakened around 8:00 a.m. Shortly thereafter, the defendant came out of the back bedroom and the victim noticed that his eyes were "crazy-looking." When the victim asked the defendant for a ride home, the defendant responded by stating, "Bitch, you're going to f--k me." The defendant began to "throw[] things" and punched the victim in the jaw. Before the victim could unlock the door, the defendant pulled her back into a chair and held a knife to her. The defendant then said that he had "something better" as he walked toward the couch. Although the victim anticipated that the defendant would retrieve a gun, he did not.

At that point, the defendant "pulled his boxers off, got on top of [the victim] and [she] kneed him as hard as [she] could in the groin. He fell, and then [she] ran and unlocked the . . . bottom lock and ran." During this time, the defendant made comments such as, "'You're going to f--k me,' and things of that nature." After the victim left the apartment, the unclothed defendant jumped on a car. As the defendant chased the victim, two elderly ladies observed what was happening, let the victim in the car, and drove her to the police department. Upon arriving at the police department, the victim informed officers that a black male at the Townview complex had attempted to rape her. When she returned to the scene with officers, she found the door open, the apartment ransacked, and her shoes and purse inside.

On cross-examination, the victim denied trying to kiss the defendant the night before the incident. Although she stated that her jaw was bruised and sore from the defendant's punch, she could not recall which side of her face was hit. She further stated that she did not seek medical attention for the injury. She testified that the knife the defendant held to her was either knocked out of his hand or dropped during the struggle. Finally, although she stated her pants were ripped during the encounter, she was unable to say where those pants were.

On redirect examination, the victim stated that the Knoxville Police Department did not confiscate the clothes she was wearing on the day of the incident and further noted that she did not have a change of clothes with her at that time.

Next, Officer Travis Schuler testified that he patrolled the Townview area in his capacity as an employee of the Knoxville Police Department in March 2003. During that time, he had occasion to respond to two calls reporting an unclothed man in the Townview parking lot. Upon arrival, he discovered a subject, identified as the defendant, wearing only a wristwatch and socks. Officer Schuler attempted unsuccessfully to talk to the defendant and ultimately arrested him after a brief struggle. Officer Schuler also called for an ambulance to attend to the defendant because he felt that "something wasn't right" and that medical attention was needed. Officer Schuler indicated that the

defendant never gave the responding officers any information and did not report that he had been robbed.

On cross-examination, Officer Schuler testified that he was not certain whether the defendant had a mental disorder or was intoxicated. He further acknowledged that individuals sometimes file false reports "to make . . . their side of the story a little better."

Officer Craig McNew testified that he was employed by the Knoxville Police Department as a patrolman for the central district, which includes downtown Knoxville. He, too, responded to a call involving the defendant at the Townview complex in March 2003. Upon arriving, Officer McNew saw Officers Schuler and Foster detaining an unclothed black male in the Townview Terrace parking lot. Although he attempted to interview the defendant briefly, Officer McNew only received "scattered information." Specifically, he noted that the defendant was not able to explain his condition and did not report that he had been robbed. Officer McNew assisted the other responding officers in arresting the defendant. He then traveled to the police station to meet with the victim and to return with her to the complex to establish a crime scene.

Officer McNew described the victim as "visibly upset and distraught over something that had happened to her." He described the apartment living room as "in such disarray [that] you could tell that there had been a large struggle there." He also reported finding a steak knife on the floor of the apartment and a folding knife on the coffee table, the latter of which was identified by the victim as the one used in the incident.

On cross-examination, Officer McNew testified that he did not recall whether the victim informed him that she had contact with the defendant the night before the incident. He further acknowledged that all of the information in the police report came from the victim. He stated that he did not recall seeing any cuts or abrasions on the victim and that he made no reference to redness or bruising of the victim's face in the police report.

On redirect examination, Officer McNew testified that his report indicated that the victim was wearing "a pair of sweat pants, a T-shirt, and one sock." It was also noted in the report that the defendant told officers that "he was doing some X," a reference to the controlled substance Ecstasy, and that he was still "rolling," a term which was interpreted by Officer McNew to mean high or intoxicated.

Shanelle Moore testified that she had known the defendant for three years and that she was with him the night before his arrest. At that time, she saw the defendant and the victim together and noted that the defendant introduced the victim as "[his] girl, Karla." Moore described the pair as "lovey-dovey" at the after party and noted that they were "hugging, kissing, and going on" between six and eight o'clock the morning of the incident.

On cross-examination, Moore acknowledged that she had been ordered to stay away from the Townview complex and that she was in violation of the order by attending the after party. She

further admitted that on the day of the incident, she was found to be in possession of pills which she believed were Valium but that were, in fact, Ecstasy. Moore testified that she was not at the apartment at the time of the incident but that she returned to the apartment later that afternoon. She stated that she never disclosed the information she had to the police.

On redirect examination, Moore recalled that the police never attempted to interview her. On recross-examination, she testified that she discovered that the defendant had been arrested for attempted aggravated rape on the day of the incident but did not attempt to offer any information to the police. She further stated that everyone at the after party "was on Ecstasy or something" but stated that she could remember what happened because "Ecstasy don't make you forget nothing." Finally, she stated that the defendant had not given her drugs that night but that they had used drugs together previously.

Shernerick Twitty testified that she saw the defendant on the night before his arrest and on the morning of his arrest. She reiterated that the defendant and victim were together the night before and that the defendant introduced the victim as "his girl, Karla." She further noted that the defendant and victim were "hugged up" the night before the incident. She stated that, while at the nightclub, the defendant gave pills to several people, including the victim. Twitty testified that she last saw the defendant and victim before she left her apartment at approximately 7:30 a.m. She stated that they both separately asked if they could stay at the apartment after she left.

On cross-examination, Twitty testified that she left her apartment that morning to go to another after party where she consumed more drugs and alcohol before returning to the apartment. She stated that, upon returning to find her apartment in disarray, she called the police, who informed her that an attempted rape had occurred there. Finally, Twitty admitted being charged with theft as a juvenile.

As the final witness at trial, Tyra Jones testified that she was a resident of the Townview complex and was waiting outside for her ride to church when she saw the victim run in front of her holding a handful of money. She stated that she turned to see the defendant, wearing nothing but socks, yelling, "Bitch, you robbed me. She robbed me." Jones testified that she went home after observing the incident "'cause [she did not] like getting involved with all that."

On cross-examination, Jones testified that she had known the defendant for nine years because she had grown up near him. She recalled that the defendant "looked really messed up" as he chased the victim through the complex. Jones acknowledged that she did not report what she had seen to the police. Finally, she admitted committing a burglary with Ira Grimes on July 19, 2002. On redirect examination, Jones testified that she would not commit perjury to protect the defendant and noted that the police never attempted to interview her. Following the presentation of proof, the jury convicted the defendant of the lesser included offense of attempted sexual battery.

-4-

Analysis

On appeal, the defendant contends that the State improperly impeached Twitty and Jones by failing to first request a jury-out hearing before impeaching them with prior bad acts committed as juveniles. Tenn. R. Evid. 608(b)(1). He further alleges that the trial court erred in failing to grant a mistrial or, alternatively, issue a curative instruction after discovering that Jones' juvenile burglary charge resulted in a dismissal.

The following is an excerpt of the testimony elicited from Twitty on cross-examination:

Q: Everything you told us today, you told Craig McNew –
A: Yes.
Q: –McNew; is that right? You're the same Shernerick Twitty that committed the offense of theft on March 24th of 2000; is that right?
A: Did I what?
Q: March 24th of 2000 you committed the crime of theft?
A: March 24th of 2000 –
Q: 2000.
A: Where was this taken place at? I committed a theft?
Q: Yeah. Your birth – date of birth is November 21st, 1982, isn't it?
A: Yes, but . . .
Q: As a juvenile?
A: When was this?
Q: When you were a juvenile?
A: How old was I? I mean, where did this take place? I mean, I – I'm not understanding. I mean, I haven't got charged with a theft.
Q: You've never been charged with a theft?
A: No.
Q: Even as a juvenile?
A: Yes.
Q: All right.
A: Only thing I've been charged with was not going home, as a juvenile.
[State]: That's all.
[Defense Counsel]:___Thank you, Ms. Twitty.

Similarly, the following question was asked at the conclusion of the cross-examination of Jones:

Q: You're the same Tyra Jones that committed the offense of burglary back on July 19th, 2002, with one Ira Grimes?
A: Yes, sir.
[State]: Thank you.

Although no contemporaneous objection was raised during the trial, after the jury retired to deliberate, defense counsel objected to the improper impeachment of Twitty and, more particularly, Jones. Counsel noted that both witnesses presented key evidence for the defense and that the incidents alluded to on cross-examination were, in both instances, juvenile charges and, in Jones' case, resulted in a dismissal. The State retorted that neither charge was insinuated to be a

-5-

conviction and that both were proper subjects for impeachment under Tennessee Rule of Evidence 608. The trial court found the issue to be waived for lack of a timely objection and denied the defense motion for a mistrial or a curative instruction.

Rule 608 states the following, in pertinent part:

(b) Specific Instances of Conduct. – Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;
>
> . . . .

(c) Juvenile Conduct. – Evidence of specific instances of conduct of a witness committed while the witness was a juvenile is generally not admissible under this rule. The court may, however, allow evidence of such conduct of a witness other than the accused in a criminal case if the conduct would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination in a civil action or criminal proceeding.

This court's opinion in State v. Philpott further illuminates the purpose and scope of this rule:

While the rule is not clear as to who must request the hearing, the party seeking the use of a criminal conviction to impeach must request a jury-out hearing to determine its admissibility. State v. Davis, 741 S.W.2d 120, 123 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1987). The purpose of the hearing is to eliminate the possibility that the jury will hear the question and its response before a judge has the opportunity to rule. Neil P. Cohen, Donald F. Paine, Sarah Y. Sheppeard, Tennessee Law of Evidence, § 608.3, at 265 (2d ed. 1990). Moreover, where a party inquires about specific instances of conduct on cross-examination, "the witness should be asked about the act itself, not about rumors, arrests, charges or indictments for the act." Id. at 267.

882 S.W.2d 394, 404 (Tenn. Crim. App. 1994), appeal denied, (Tenn. July 5, 1994).

Upon review of the record, we conclude that the State erred in failing to seek a jury-out hearing before impeaching Twitty and Jones. Philpott holds that the impeaching party must request a jury-out hearing when the subject of the impeachment is a specific instance of conduct. Therefore, the State should have requested a jury-out hearing before impeaching the witnesses, pursuant to Rule 608(b)(1).

Nonetheless, we conclude that the issue at hand was waived for failure to timely object. See Tenn. R. Evid. 103(1). Furthermore, counsel's request for a mistrial or a curative instruction was

raised only after jury deliberations began and was too late. Therefore, while we certainly disapprove of the State's conduct, in light of the circumstances of the case, we decline to grant relief.

## Conclusion

The judgment of the trial court is affirmed.

 

 

_____
JOHN EVERETT WILLIAMS, JUDGE